LANGHORNE
*vs.*
PAYNE.

---

CHANCERY

Case 35.

### Langhorne *vs.* Payne.

#### APPEAL FROM BRACKEN CIRCUIT COURT.

1. No writ of error lies to reverse a decree after the lapse of three years after it is rendered, and bills of review are limited to the same period.

2. P. being indebted to L. gave a mortgage upon certain lands to secure the debt, L. gave P. authority to sell to pay the debts, L. dying his administratrix made an agreement with P. by which a decree was rendered, the land sold, and the administrator became the purchaser under an agreement with P. that he should still go on to sell to raise funds to pay the debt, and that in that way the debt was to be extinguished, and the remainder belong to P., mortgagor, and the lands were sold and the debt paid. Held, there appearing no fraud, that P. had a right to a decree for the lands purchased by the administrator of P., and not sold to pay the debt.

Case stated.

On the 3d of December, 1831, John Payne executed a deed of mortgage to John T. Langhorne, conveying a large number of tracts of land to secure the payment of a number of debts expressed in the mortgage. On the fifth of the same month Langhorne executed to Payne a paper, in the nature of a defeasance, in which it is recited that Langhorne had previously purchased sundry tracts of land which had been sold as the property of Payne under executions, and that Langhorne was surety for Payne in other debts and contracts; and Payne being indebted to Langhorne personally, all of which are said to be set forth in the deed of mortgage executed by Payne to Langhorne of the 3d December. And that Payne had agreed to execute to Langhorne other security. Langhorne agreed to re-convey to

Payne all the property purchased by Langhorne at sheriff's sale, as also all the property conveyed in the deed of mortgage, so soon as Payne pays the debts expressed in the mortgage, he, Langhorne, only holding the property as an indemnity and security for the debts, and for the purpose of more speedily discharging said debts. John Payne is appointed attorney in fact, and authorized to sell and convey as more fully appears by the letter of attorney.

The mortgage purports to be made to secure $1,800 due to Langhorne, $800 and $5,000 due Tureman, $2,700 due Armstrong, and covers the following property: 34,000 acres of land in Nicholas, Bracken, and Mason counties; John Payne's interest in a tract of land in Mason, on which Duval Payne resided; his interest in a tract in Montgomery of 2,000 acres; a lot in Mayslick; 200 acres in Hopkins county; three-fourths of a tract of land once owned by Giliam; five slaves, horses, &c., all of which was to remain in John Payne's possession until Langhorne should demand it.

John T. Langhorne having died Eliza B. Langhorne qualified as administratrix, and in June, 1836, filed her bill in the Bracken circuit court for a foreclosure of the mortgage, and claiming that Payne was indebted to the estate of Langhorne $1,800 by note, with interest from April, 1829, and that she and her intestate had paid on the judgment of Tureman $4,000 as surety for John Payne, and praying that the whole property described in the mortgage and two deeds from the sheriff of Bracken, might be sold to satisfy the said sums of money and interest. In September, 1836, John Payne answered admitting every allegation of the bill, consented that the proper decree be rendered, and the property sold, which was done, and a commissioner appointed to sell. In June, 1837, the commissioner made a report of a sale of all the land, which was made at the January county court, 1837. The sale embraced all the property described in the two sheriff's deeds and mortgage, being twenty-two tracts in all, all which was purchased by Mrs. Lang-

horne except one tract, for the aggregate sum of $1,360, and Thomas Y. Payne became the purchaser of one tract of 200 acres lying on the Ohio river for $100. The commissioner reported a deed to Mrs. Langhorne, which was approved by the court, and ordered to record; time was given the commissioner to sell the personal property. In March term, 1838, the case was continued for commissioner's report, and no special order made in the case again until March, 1849, when John Payne, upon leave of the court, filed an answer in the nature of a cross-bill.

In this answer and cross-bill filed by Payne he in substance sets out the arrangement that existed between himself and John T. Langhorne, his death, and the qualification of Mrs. Langhorne as administratrix; and that by agreement and consent the bill was filed, and decree of sale rendered, and a sale made, and the purchase by Mrs. Langhorne of all the lands except the 200 acres for her by her agent, Thomas Y Payne, in order that she might thereby become possessed of the legal title to the land, and have it in her power to continue and carry out the previous arrangement which existed between her husband and Payne that in pursuance of that agreement she gave him a power of attorney to sell the land, and thereby to raise the means of paying off the debts set out in the mortgage. He further charges, that a sufficient fund was raised in that way by sales to discharge all the debts due by him to Langhorne's estate, either as surety or otherwise, and that he had a settlement with Thos. Y. Payne, the authorized agent of Mrs. Langhorne. The power of attorney from Mrs. Langhorne is dated in January, 1837, and authorizes John Payne to sell land, receive money and notes, and hand the same over to her. Another amendment, filed at the same term, sets out more in detail the land sold, prices, &c., by the commissioner, and the aggregate sales at $1,360, and the real value he estimates at $46,954.

In another amendment Payne charges that it was the express agreement between himself and Thomas

Y. Payne, acting as agent and attorney of Mrs. Langhorne, that the land was to be purchased by him as agent, and held by Mrs. Langhorne as security for her debts, and any remainder to be for the benefit of him, Payne. This agreement was reduced to writing with Thomas Y. Payne in 1846, and that the property was sold at great sacrifice in consequence of this arrangement. He claims to have fully paid the estate of Langhorne the full amount due from him.

In 1850 Mrs. Langhorne answered these cross-bills. She admits the purchases made by her husband of Payne in 1831, the execution of the mortgage and defeasance, and power of attorney, but says her husband before his death revoked the power of attorney given to Payne, because of his unfaithfulness. She admits the filing of her bill to foreclose the mortgage, and subsequent proceeding, but denies any arrangement such as is alleged by Payne in his answer and cross-bill, or that Thos. Y. Payne had any authority to make it in her name. Says the sale was made without any arrangement whatever; refers to and exhibits an answer of John Payne, filed for an exhibit of assets in another suit, in which he says nothing of any such interest in these lands as he now claims. She denies any consideration for such an arrangement; denies fraud; that the lands were of little value when sold; admits the power of attorney but says she revoked it in March, 1846, and appointed Mr. Waller in March, 1847, her agent. The heirs of J. T. Langhorne are made parties.

In 1852 John Payne filed another amended answer, in which he recapitulates the history of the whole case, and makes J. B. Waller defendant. The heirs of Langhorne answer substantially as their mother. They rely upon the decree of sale of 1836, and claim the benefit thereof. Payne filed a replication in which he again repeats the allegation of Thomas Y. Payne's agency for Mr. Langhorne, and claims to have fully paid off the mortgage debts.

On final hearing the court sustained the claim of Payne, and decreeds in his favor, to reverse which the heirs and administratrix of Langhorne prosecute this appeal.

H. WALLER and J. HARLAN, for appellants—

The appellants rely upon the following grounds for the reversal of the decree of the circuit court:

1. The decree rendered in this suit in September, 1837, was a final decree, because it ascertained the amount due from John Payne to Langhorne's representative, and directed a sale of property for its payment. This court decided in *Banton v. Campbell's heirs*, 2 *Dana*, 422, that every order or decree made in a chancery cause, which decides and settles the rights of the parties as to any particular matter, is so far final that an appeal or writ of error may be prosecuted from it, although the suit remains in the circuit court, for other matters in the bill to be adjudicated; and the time to bar a writ of error on any such order or decree is to be computed from *its date*, not from the last decision in the cause; same principle decided in *Field v. Ross*, 1 *Monroe*, 136; and *Story v. Hawkins*, 8 *Dana*, 12; 2 *Dana*, 422.

It follows that if the pleadings filed by John Payne in March, 1849, called an amended answer, and all the subsequent amendments thereto, (some of which profess to review the decree,) is to be regarded as a bill of review, it is barred by lapse of time—the filing of a bill of review being limited to the same time as a writ of error.

2. If it be regarded as a bill to impeach the decree for fraud, it cannot be sustained because no issue of that sort is made—there is no charge of fraud.

3. If it be a bill to enforce a resulting trust, it cannot be sustained, because the facts do not bring the case within the principles of a resulting trust. It was decided shortly after the passage of the 29 Charles 2d, that if an estate be purchased with the money of one person, and the estate is conveyed to a third per-

son, who is a stranger in blood, that person will be a trustee for the person who advanced the money, and it is such a resulting trust by implication of law as is saved by the statute, and there is no need for a declaration of trust—2 *Spenc'es Eq.*, 201. This court, in the case of *Letcher v. Letcher's heirs*, 4 *J. J. Marshall*, 592, determined what facts constituted a resulting trust; the principles there settled do not embrace this case.

4. It is a case where one is attempting to obtain a title to real estate by force of parol testimony in violation of the statute of frauds. It is not necessary to say to this court that such a claim cannot be sustained by parol proof.

5. Nor can it be sustained by the declaration of trust executed by Thomas Y. Payne in January, 1846, when he attempted to make a settlement with John Payne, of his actings and doings as the agent of Mrs. Langhorne, under the power of attorney executed by her, authorizing him to sell the lands and pay over the money, or deliver the notes received from the purchasers—1. Because Thomas Y. Payne had no power to execute any such paper. 2. His authority was merely to settle with the agent of his client, to ascertain from him the amount of money received, and the securities taken by him for lands sold, for up to this time the estate had received nothing upon the claims against John Payne. If Thomas Y. Payne ever had any such authority it was revoked in 1840, and H. Waller substituted, as proved by Payne himself. The fact is he was selected as the only person who could obtain from John Payne an account of his stewardship, to obtain which was the extent of the power conferred upon Thomas Y. Payne.

6. The error, if it be an error, of failing to make the heirs of Langhorne parties to the bill to foreclose, does not render that decree void but only erroneous, and the time for review or reversal has passed. They were perhaps proper but not necessary parties. The sheriff's deeds, mortgage, and defeasance of 1831,

all together, constitute the transaction but a mortgage —a security for money, and the payment of it *ipso facto* re-invests the mortgagor with the legal title— *Breckinridge's heirs v. Ormsby*, 1 *J. J. Marshall*, 257. The execution of the defeasance being admitted by all the parties, its efficacy is the same as if it had been recorded.

7. The whole arrangment between Langhorne and John Payne was a scheme invented by Payne to protect his property from creditors; on this point the court are referred to all the circumstances appearing in the case, and to the cases of *Ford's ex'or v. Lewis*, 10 *B. Monroe*, 227; *and Hudgens v. Dedman's ex'or*, at *this term;* 1 *Marsh.*, 210; 2 *Ib.*, 57; 3 *Ib.*, 475; 2 *Litt.* 12; 4 *Bibb*, 65–70; 9 *Dana*, 317; 7 *B. Monroe*, 585.

8. The supposed appreciation of the property should have no influence upon the decision of the case. Mrs. Langhorne has done nothing but her duty in endeavoring to collect the debts due her husband's estate.

M. C. JOHNSON and T. Y. PAYNE, *for appellee*—

Two questions only can arise in this case:

1. Was there any fraud in the original transaction between John Payne and John T. Langhorne, as against the creditors of Payne, which should induce the chancellor to withhold his aid.

2. Was the transaction between Eliza B. Langhorne and John Payne, in 1836, a case coming under the operation of the statute of frauds and perjuries, and requiring of the chancellor that he should not give relief.

On the first point counsel rely—1. Upon the facts of the case as clearly showing that Payne, though considerably involved, had secured a large portion, if not all his creditors, before Langhorne, and there is no ground to impute fraud to him. The debt of Langhorne was a *bona fide* debt, really due. 2. That the transaction between Mrs. Langhorne and John Payne

is obligatory between the parties, as Mrs. Langhorne, if there was fraud, cannot avail herself of it.

On the second point the proof is, that the contract with Eliza B. Langhorne was reduced to writing, though not at the time it was made—it was in 1846, and according to the original terms, as the proof clearly shows.

A trust resulted to John Payne so soon as the mortgage debts were satisfied. The case is analogous to *Letcher v. Letcher's heirs,* 4 *J. J. Marshall,* 592, and authorities there cited.

F. T. HORD, on the same side—

1. There is no evidence in the cause to authorize the conclusion that there was any fraud in the transaction between John Payne and John T. Langhorne, on the contrary, the proof shows that Payne had secured all his creditors, leaving Langhorne for the last. That John T. Langhorne and Eliza B. Langhorne are both estopped by their answers filed in the Augusta College case, to make the charge.

2. That the Langhornes having held under the mortgage, had a satisfaction of their debt out of the mortgaged property, cannot rely upon fraud in the mortgage, and hold on to the remainder of the property against the mortgagor.

3. The court will not presume fraud or infer it from slight circumstances, especially when it works iniquity.

4. Payne having discharged the whole mortgage debt has a right to demand a re-conveyance of the title to the mortgaged property, unless the agreement made with Eliza B. Langhorne has destroyed that right.

5. That the arrangement was made with Eliza B. Langhorne, because the heirs of Langhorne were not parties to that arrangement, and they held the legal title under the mortgage.

6. The statute of frauds and perjuries has no application to the case, and presents no bar to the relief

asked of the chancellor. By the purchase of the land at the commissioner's sale Mrs. Langhorne bought John Payne's equity alone—it was not the estate purchased. Payne seeks no decree against her, he only asks that the heirs of Langhorne re-invest him with the legal title, the mortgage debt being fully paid to the administratrix. There is no contest with the heirs at law—it is a contest between Payne and the administratrix whether he shall have the land or she have it. The equity of Payne to redeem should be preferred for these reasons—1. The agreement made by Mrs. Langhorne through her agents, T. Y. Payne with John Payne, by which the land was sold and she purchased, and was to hold and sell to pay the mortgage debt, and John Payne have the residue, constituted her a trustee for a particular purpose, and when that purpose was accomplished her power and right ceased. 2. This agreement being made known on the day of sale prevented competition in bidding, and produced a sale at a great sacrifice, and it would be sanctioning fraud to permit Mrs. Langhorne to hold on to the purchase, and hold under and in opposition to the contract of the agent for the sale of the land. 3. Mrs. Langhorne never regarded her purchase of the land as depriving John Payne of his right to redeem, as is manifest from the fact that she never listed the land for taxation. She never took the possession or execised acts of ownership over it; never asked for a writ of possession, but permitted John Payne to remain in possession, pay the taxes, and have the same conveyed at his own costs and charges ; to run off the land, sell it and pay the proceeds upon the mortgage due to John T. Langhorne's estate. We ask an affirmance.

September 25.    Judge CRENSHAW delivered the opinion of the court.

1. No writ of error lies to reverse a decree after the lapse

The decree rendered in favor of Mrs. Langhorne in 1836, for the forecloseure of Payne's equity of redemption, and the sale of the lands in controversy, was final, and no writ of error could have been prosecuted

to reverse that decree after three years from its redition; and bills of review are limited to the same period. When Payne filed his cross-bill of review some ten years had elapsed from the rendition of the decree, and, as a bill of review, it was barred by time. This controversy, therefore, must be determined, not by a review of the decree of 1836, but from a consideration of the equity alleged by Payne to exist in his favor. This alleged equity arises out of an arrangement charged to have been made with Thomas Y. Payne, the agent of Mrs. Langhorne, whereby the decree of 1836, for the sale of the land, was obtained, and the sale made, and the lands purchased by the agent of Mrs. Langhorne at an immense sacrifice.

It is proved by Thomas Y. Payne that such an arrangement was made, and that it was by the consent and approbation of Mrs. Langhorne. But, if the arrangement was made, we apprehend that its effect must be the same, whether made by the consent and approbation of Mrs. Langhorne or not—what may have been done by her agent must be regarded as done by herself; and the consequences to John Payne are the same, whether done by her in person or through her agent. And that the alleged arrangement was made, is, we think, satisfactorily shown by the record. Indeed we think that a contrary conclusion cannot be rationally deduced from the facts and circumstances developed in the cause.

In the lifetime of John T. Langhorne John Payne had been empowered by him to sell these lands for the purpose of extinguishing the debts due by Payne to Langhorne, and under the mortgage to Langhorne, and the defeasance to Payne, any lands which might remain after the satisfaction of the debts, would of course belong to Payne. And, notwithstanding the revocation of the power of attorney to Payne by Langhorne, Payne would still be entitled to whatever might remain after the payment of Langhorne's claims upon and liabilities for Payne. Thus the matter stood between Payne and Langhorne, at Lang-

2. P. being indebted to L. gave a mortgage upon certain lands to secure the debt, L. gave P. authority to sell to pay the debts, L. dying his administratrix made an agreement with P. by which a decree was rendered, the land sold, and the administrator became

LANGHORNE
vs.
PAYNE.

the purchaser
under an agree-
ment with P.
that he should
still go on to
sell to raise
funds to pay the
debt, and that
in that way the
debt was to be
extinguished,
and the remain-
der belong to
P., mortgagor,
and the lands
were sold and
the debt paid.
Held, there ap-
pearing no
fraud, that P.
had a right to a
decree for the
lands purchas-
ed by the ad-
ministrator of
P., and not sold
to pay the debt.

horne's death in 1832 or 1833. In consequence of
Langhorne's death the legal title to the land descend-
ed to his infant heirs, and no further sales could be
made so as to vest purchasers with complete titles.
In this state of things it was natural and reasonable
that an arrangement should be desired, whereby sales.
might be continued and good title made, as by this
means only could money continue to be realized for
the extinguishment of the claims of Langhorne.
And, according to the proof, it was agreed that Mrs.
Langhorne, the administratrix of her husband, should
file her bill, foreclose Payne's equity of redemption,
sell, and purchase the lands, in order that sales and
titles might be made as in the lifetime of John T.
Langhorne, and that Payne should still have the re-
mainder after paying his dues to Langhorne. In
short, the agreement as proved, was, that Payne
should still have his equity in the lands, as if no de-
cretal sale had been made.

That such was the agreement appears not only
from the testimony of Thomas Y. Payne, but from
circumstances exhibited in the record. After the de-
cretal sale, at which Mrs. Langhorne became the pur-
chaser, John Payne was empowered to sell the lands,
and pay over the proceeds to Mrs. Langhorne; he
continued to give in and pay the taxes on the lands,
as before the sale, and Mrs. Langhorne neither gave
them in for taxation, nor paid the taxes thereon; she
exercised no other or further control over them, ex-
cept through her power of attorney to Payne to sell
them, than she had done before the sale and purchase
under the decree. And matters continued thus for
more than ten years after the decretal sale, when, on
the 26th of April, 1847, Mr. Waller, son-in-law and
agent of Mrs. Langhorne, receipted to John Payne for
a list of claims of some $5,000, headed "a list of
notes delivered over by John Payne to Eliza B. Lang-
horne for land sold by him as her agent, on account of
*his debt to her*." From this it would seem that the
proceeds of the lands were still regarded as a means

of extinguishing the debts owing by Payne to Lang-
horne, which is inconsistent with the idea of absolute
ownership by Mrs. Langhorne in the lands, but is
altogether consistent with the idea of an equity there-
in on the part of Payne. Other circumstances might
be mentioned, tending to corroborate the testimony of
Thomas Y. Payne, but it is deemed unnecessary to
do so.

It is equally clear to our minds that in consequence
of the alleged arrangement above alluded to, and
commented on, the lands were sold at a great sacri-
fice; this is manifested by the testimony of T. Y.
Payne, Orr, and Schoolfield. But it is insisted, that
whatever may have been the agreement, and however
great the sacrifice in the sale, the agreement was in
parol, and cannot be inforced, as it comes within the
statute of frauds and perjuries. It is true that an
agreement in parol, that one shall purchase land in
his own name, with his own money, but in part or in
whole for the benefit of another, cannot be inforced
by the latter under ordinary circumstances, yet it is
equally a principle of law that one cannot be depriv-
ed of his land or other property by another through
fraud actual or constructive. It seems to be a clear
principle of equity that if my land is about to be sold
at public sale, and a professed friend should agree
with me that he would purchase it in for my benefit,
and this agreement is made known and understood by
persons attending the sale, and they, in consequence
thereof, decline to bid, and my land is purchased in
by my professed friend at a great sacrifice, it would
be a fraud upon my rights for him to hold my proper-
ty in opposition to my claim under the agreement.
Nay, whether there had been any agreement or not
with the purchaser, if, by his instrumentality, others
had been prevented from bidding, and he had thereby
acquired my land at a sacrifice, he could not, ac-
cording to the principles of the case of *Martin v.
Blight's heirs*, 4 *J. J. Marshall*, hold it. Much less
ought he to be allowed to do so, where the same ob-

ject, by like means, has been effected under an agreement; for, in the latter case, others have not only been prevented from bidding, but trust and confidence have been betrayed. Why is it that after land has been sold under execution for less than two-thirds of its value, and the time of redemption has passed, and the title become complete, the defendant in execution is allowed still to redeem, where he has been lulled and deceived by parol promises, until the twelve months allowed for redemption have expired? Because, to permit the purchaser to hold the land under such circumstances, would be a fraud upon the rights of the defendant in the execution. That a state of case is presented in the record, which comes within the principles mentioned is, we think, beyond cavil.

But it is contended, that in the arrangement with John T. Langhorne in his lifetime, and in the arrangement with Mrs. Langhorne through her agent, Thomas Y. Payne, John Payne had the guilty purpose of hindering and delaying his creditors, and consequently the chancellor should turn a deaf ear to the prayer of his bill.

It is true that Payne was much embarrassed at the time of his arrangement with J. T. Langhorne, but it appears that he had liberally mortgaged property to his creditors for their indemnity, and that Langhorne was about the last creditor whom, in like manner, he secured. That he was largely indebted to Langhorne no one pretends to question, and that it was his duty to secure Langhorne in his debts and liabilities is equally unquestionable. The claims of Langhorne were real, not pretended, and, although the statements of Payne in his different answers are not altogether consistent, yet we do not think there is enough in the record to authorize the court to convict him of fraud. Mrs. Langhorne, in her answer to the suit of the trustees of the Bracken Academy, exonerates her husband from all fraud in the transaction with Payne, and it would be difficult to fix fraud upon Payne without involving the integrity of J. T. Lang-

horne also. He was the brother-in-law of Payne, and doubtless knew a good deal in regard to his embarrassments and purposes, and, if Payne were guilty of fraud in the arrangement made with him, it is not so easy to exculpate him. It would seem that if one is exonerated both should be.

In view of all that appears in the record, we do not feel authorized to conclude that either of them, by the mortgage to Langhorne, and defeasance to Payne for the lands purchased under execution, was guilty of a fraud upon Payne's creditors, the most of whose debts appear since to have been paid. It is urged, however, that Payne in his answers to the bill of the trustees of the Bracken Academy, failed to disclose his entire arrangement with Langhorne. But this is a mistake, he disclosed the defeasance executed to him by Langhorne, in his first answer, so that the trustees were enabled to see his entire equity in the lands purchased by and mortgaged to Langhorne. It is true, that in a subsequent answer, in enumerating certain lands other than those held by Langhorne, he states that they were *all* the lands that he recollected, which he claimed title to in Kentucky, But he had already made known his equity in the lands held by Langhorne, and there was no impropriety in not mentioning it again. It cannot be said that he intended to deceive by concealing that which he had already disclosed. Besides, if he had actually deceived the trustees by a disingenuous answer, a fraud upon *them* could not, we suppose, contaminate the transaction between Payne and Langhorne.

As to the arrangement by which the mortgage to Langhorne was foreclosed, and a sale effected of the lands, we have already said that it was natural to desire it, in order to effectuate the original purpose had in view both by Payne and Langhorne; and we can see a sufficient motive, not vicious in character, to prompt him to this arrangement, and it would be improper to charge him with fraud in a transaction for which we can perceive an honorable and upright in-

ducement. Still his motives may have been dishonorable, but we are not satisfied from the record that they were. Fraud cannot be presumed, but must be proved—proved, to be sure, from circumstances, as other facts may be proved, but it should not be fastened upon a man merely because the circumstances may produce suspicion of illegitimacy of purpose, especially in a case where a contrary conclusion will work injury to no one. By refusing the prayer of Payne great injustice might be done, but if it be granted, Mrs. Langhorne, it seems, will get her whole claim with interest, and can have, we think, no just cause to complain.

Wherefore, the decree is affirmed.